IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN RE: ) | |
| ) | |
| SHEEHAN PIPE LINE CONSTRUCTION ) | Case No. 16-10678 |
| COMPANY, ) | (Chapter 11) |
| ) | |
| Debtor. ) | |
| ) | |

**MOTION FOR ORDER ESTABLISHING (a) SALE AND BIDDING
PROCEDURES AND (b) MANNER AND FORM
OF NOTICE FOR SALE OF DEBTOR'S EQUIPMENT**

Sheehan Pipe Line Construction Company, debtor and debtor in possession herein (the "Debtor"), respectfully moves this Court for the entry of an order establishing certain sale and bidding procedures (the "Bid Procedures") for the proposed sale of Equipment of the Debtor, all as more specifically set forth in the Bid Procedures attached hereto as Exhibit A. More specifically, by this Motion, Debtor seeks approval of three things: (a) the Bid Procedures (b) the form of the APA, and (c) protections under Sections 503(b) and 506(c) of the Bankruptcy Code for Stalking Horse for Debtor's use of the $1.5 million Good Faith Deposit. Terms capitalized but not defined in this Motion shall have the meanings ascribed in the Bid Procedures. In support of this Motion, Debtor presents the following:

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28 U.S.C. §§1408 and 1409.

2. Debtor is filing this Motion in conjunction with and as an integral part of a separate sale motion that Debtor will file in which Debtor will seek authority to sell the Equipment of the Debtor pursuant to § 363 of the Bankruptcy Code in accordance with an Asset Purchase Agreement defined below (the "Sale Motion").

3. This bankruptcy case was commenced by the filing of a Voluntary Petition under Chapter 11 of the United States Bankruptcy Code on April 15, 2016 (the "Petition Date").

4. Debtor remains in possession of its assets and continues to manage its properties as debtor in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner in this case.

5. Debtor is an Oklahoma partnership engaged in pipeline construction. Debtor has its principal place of business in Tulsa, Oklahoma. Debtor constructs pipelines in several different states.

6. Prior to commencement of its bankruptcy case, Debtor entered into an Asset Purchase Agreement (the "APA") with Richie Bros. Auctioneers (America), Inc. ("Ritchie Bros." or "Stalking Horse") that provides for it to be a firm and stalking horse bidder for the purchase of substantially all of Debtor's Equipment for the amount of $29.5 million ("Purchase Price"), subject to certain adjustments, and subject to a project sharing arrangement that provides Debtor with additional upside. The APA anticipated the commencement of Debtor's bankruptcy case and the filing of this Motion in order to effect the purchase of the Equipment, subject to better and higher offers and Court approval.

7. Debtor is indebted to Caterpillar Financial Services Corporation ("CAT") pursuant to a Promissory Note with a current principal amount of approximately $13 million and CAT asserts a security interest in the Equipment.

8. On March 31, 2015, Debtor entered into a Security Agreement with Zurich American Insurance Company and its subsidiaries and affiliates Fidelity and Deposit Company of Maryland, Colonial American Casualty and Surety Company, and American Guarantee and Liability Insurance Company (collectively "Zurich") which granted a security interest in the

Equipment to Zurich to secure the performance and payment when due of all indebtedness, liabilities, and obligations owed by Debtor to Zurich. The Zurich lien is believed to be junior to the CAT lien.

9. The APA provides for the sale and transfer of all Equipment of Debtor pursuant to § 363(b) of the Bankruptcy Code and use of the $1.5 million Good Faith Deposit of Ritchie Bros. by Debtor to protect and preserve the Equipment and to facilitate the sale, subject to the protections of Sections 503(b) and 506(c) of the Bankruptcy Code to protect the Stalking Horse. A copy of the APA is attached hereto as Exhibit B.

10. For purposes of facilitating the proposed sale transaction and to ensure that maximum exposure and sale price can be achieved, certain sale and bid procedures should be approved by this Court prior to the Court's consideration of the Sale Motion. Debtor is requesting that the Bid Procedures be considered by the Court as soon as possible and no later than May 20, 2016. The proposed Bid Procedures seek to establish buyer protections and bidding procedures in connection with the solicitation of higher and/or better offers, including a Break-Up Fee of 3% of the Purchase Price ($885,000) and rules regarding incremental bidding.

11. Debtor negotiated the terms of the APA to induce Stalking Horse to make a firm agreement to purchase the Equipment and to create the possibility of other potential bidders making higher competing bids. Accordingly, Debtor requests approval of the Bid Procedures and of the form of the APA that will establish a competitive bidding procedure that includes buyer protection provisions and other specific bidding procedures typical for transactions of this nature, all of which are designed to ensure a fair and efficient process that will facilitate the submission of easily comparable bids while at the same time providing Stalking Horse with reasonable protections for assuming the role of a prequalified cash purchaser of the Equipment

and making the market for sale of the Equipment. The proposed Bid Procedures are set forth in detail in the attached Exhibit A. A summary of the Bid Procedures includes the following:

    (a)    The payment of a fee (the "Break-up Fee) to Stalking Horse in the amount of 3% of the Purchase Price as defined in paragraph 6(d) of the Stalking Horse APA in the event that the Court approves this Motion, the Stalking Horse is not in default under the Stalking Horse APA, and the Equipment is sold to another buyer for an amount equal to or greater than $32.5 million. The purpose of the Break-up Fee is (a) to induce Stalking Horse to incur the cost associated with its due diligence; (b) to reimburse Stalking Horse for the expenses Stalking Horse has incurred and will incur in connection with the proposed sale transaction; (c) to compensate Stalking Horse for the substantial time and effort Stalking Horse has expended and will expend as a prequalified cash purchaser to establish a safety net against which competing bids can be measured; and (d) provide a limited return to Stalking Horse for the lost opportunity to pursue other transactions. The Break-Up Fee is Stalking Horse's exclusive remedy in the event a sale is achieved but is not consummated with Stalking Horse as contemplated in the APA. The Break-Up Fee was negotiated at arms' length, and Debtor's agreement to the Break-Up Fee is an appropriate exercise of its business judgment. Moreover, considering the value to Debtor's estate of the proposed sale transaction, which consists of a cash purchase price of $29.5 million subject to adjustments, Debtor submits that the Break-Up Fee is well within the range of reasonable fees that have been approved by courts in connection with similar transactions. *See In re Tama Beef Packing, Inc.*, 312 B.R. 192, 194 (Bankr. N.D. Iowa 2004) (collecting cases and noting that "the average range of reasonableness for break-up fees and expenses is 1-4% of the purchase price"); *see also In re Texas Rangers Baseball Partners*, 431 B.R. 707, 715 (Bankr. N.D. Tex. 2010) (same and observing that "it is not uncommon for an agreement to provide for payment of the stalking horse's expenses in addition to a breakup fee.").

    (b)    Debtor proposes that any initial competing bid must exceed the Stalking Horse Purchase Price by $3 million (i.e. be at least $32.5 million). The purpose of the initial overbid amount is two-fold: (i) to protect Stalking Horse from having its offer topped by a de minimis amount by a competing bidder, who would in effect be piggy-backing on Stalking Horse's due diligence investigation and other efforts in seeking to acquire the Equipment, and (ii) to provide Debtor with funds sufficient to cover the Break-Up Fee and the repayment of the Good Faith Deposit to Stalking Horse in the event of a successful overbid. Thereafter, competing bids must be made in increments of not less than $500,000 over the initial overbid unless the Court determines under the circumstances that incremental increases in a lesser amount are appropriate.

4

(c) Any competing bid must be in a form substantially identical to the Stalking Horse APA in all material terms, i.e. all cash,[1] no financing contingencies, no further due diligence, and for all of the Equipment and not a subset (except as to necessary conforming changes to reflect a different purchaser and the higher offer). This requirement is necessary to (i) ensure comparability of bids, (ii) preserve an extensively negotiated sale structure that Debtor believes is favorable to its estate and meets the needs of its various constituents, (iii) reduce the risk of delaying the closing date, (iv) avoid lengthy negotiations with a competing bidder as to different terms of sale, and (v) eliminate the imposition of contingencies or conditions by a competing bidder that are not present in the Stalking Horse APA.

(d) Within five business days after entry of an order approving this Motion (the "Bid Procedures Order"), Debtor shall serve a copy of the Bid Procedures Order, along with a copy of the Sale Motion, on (i) all parties who have expressed, in a writing addressed to Debtor, an interest in acquiring the Equipment, (ii) the United States Trustee, (iii) counsel for any Committee, (iv) counsel for CAT, (v) counsel for Zurich, (vi) all other parties listed on the Official Service List, and (vii) any other parties Debtor reasonably believes might have an interest in acquiring the Equipment. In addition, Debtor shall publish notice of these procedures in the business sections of *The Oklahoman* and *The Tulsa World*. Such notice is sufficient notice for all parties. No other notice will be required other than as set forth herein.

(e) Debtor shall make the Equipment and any records relating thereto available to any Potential Bidder subject to execution of a confidentiality agreement agreeable to Debtor during a period from _____, 2016 to _____, 2016.

(f) Debtor may, upon approval of these Bid Procedures and entry of the Bid Procedures Order, receive and utilize the Good Faith Deposit submitted by Stalking Horse in the amount of $1,500,000 in Debtor's operations to protect, preserve and facilitate the sale of the Equipment subject to protections for the Stalking Horse as described in this Motion, the APA and in the Bid Procedures Order.

(g) In the event that Stalking Horse is successful in acquiring the Equipment, its Good Faith Deposit shall be credited against the Upfront Cash Purchase Price at Closing together with interest at 5% per annum from date of usage by Debtor until repaid. If the Equipment is sold to a Qualified Bidder that outbids Stalking Horse, an amount equal to the Good Faith Deposit amount utilized by Debtor (up to $1,500,000) together with interest calculated at 5% per annum from the date of usage, shall be paid to Stalking Horse from the overbid proceeds, in addition to payment of the Break-Up Fee due to Stalking Horse. In the event no sale is consummated, pursuant to the Bid Procedures

---

[1] While competing bids are not required to have the profit sharing component of the Stalking Horse Bid, in evaluating Qualifying Bids to determine the Successful Bid, Debtor will consider all such Qualifying Bids against the Stalking Horse Bid and the unique profit sharing provisions agreed to by Debtor and Stalking Horse, which, in Debtor's business judgment, may require an estimate by the Bankruptcy Court of the net value of the profit sharing component.

Order, Stalking Horse shall be entitled to an amount necessary to reimburse Stalking Horse in the amount of its Good Faith Deposit utilized by Debtor plus interest at 5% per annum from date of usage by Debtor until repaid from the proceeds of any sale of the Equipment, with Stalking Horse being granted an administrative expense claim under 11 U.S.C 503(b) and a surcharge on the Equipment under 11 U.S.C §506(c).

12. Debtor submits that the Bid Procedures provide a fair and reasonable means of ensuring that the Equipment is sold for the highest and best terms attainable, and that such procedures should be approved by this Court.

13. Debtor seeks entry of an order approving the Bid Procedures for the sale of the Equipment. Debtor also seeks authority to pay the Break-Up Fee to Stalking Horse in the event that a party other than Stalking Horse is approved as the buyer of the Equipment and ultimately acquires the Equipment.

14. The proposed Bid Procedures serve the interests of Debtor, its estate and its creditors. The Bid Procedures themselves are fair, reasonable and productive because they will permit Debtor to conduct an orderly sale and obtain the best possible price on acceptable terms for the Equipment.

15. The Bid Procedures have been carefully negotiated and crafted to ensure that maximum return is achieved from the sale of the Equipment. The Bid Procedures will also ensure that all bids will be comparable by requiring all bids to be on substantially the same terms and conditions as the bid of Stalking Horse. If competing bidders appear, Debtor and the Court will need to determine which bid is the highest and best. The comparability requirements of the Bid Procedures will make it possible to accomplish this task.

16. The Bid Procedures require that potential bidders meet certain requirement to be considered a "Qualified Bidder." One significant factor is for a potential bidder to demonstrate its capacity to complete a cash transaction, and either to resell the Equipment and share profits as

set forth in the APA or for the Debtor to consider the value of the unique profit sharing provisions agreed to by Debtor and Stalking Horse in evaluating Qualifying Bids. It would be a serious loss if Debtor surrendered its opportunity to sell the Equipment to Stalking Horse only to discover that the competing bidder is incapable of consummating the transaction.

17. The payment of break-up fees as part of a sale process is a generally accepted practice. Break-up fees encourage an initial purchaser to invest the time, effort and money necessary to make a bid for and consummate the purchase of a debtor's assets, despite the possibility that such purchaser may not ultimately acquire the Equipment. As such, the Bid Procedures are important tools to be used to encourage bidding. The determination of whether a break-up fee should be allowed is made based on whether the fees are necessary to preserve the value of the estate. *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 534 (3d Cir. 1999); *In re Tama Beef Packing, Inc.*, 290 B.R. 90, 97-98 (8th Cir. BAP 2003). The considerations that underlie a debtor's business judgment to pay the break-up fee are relevant to the Bankruptcy Court's determination on the request. *Id.* Indeed, many courts have evaluated break-up fee arrangements under the business judgment rule standard. *Cottle v. Storer Communications, Inc.*, 849 F.2d 570 (11th Cir. 1988); *In re Integrated Resources, Inc.*, 147 B.R. 650, 657 (S.D.N.Y. 1992), *appeal dismissed,* 3 F.3d 49 (2d Cir. 1993).

18. A business judgment rule standard is applied to validate a debtor's decision to enter into a break-up fee to the extent the following three questions are answered in the negative:

  (a) is the relationship of the parties who negotiated a breakup fee tainted by self-dealing or manipulation;

  (b) does the fee hamper bidding; and

   (c) is the amount of the fee unreasonable relative to the proposed purchase price?

*Integrated Resources*, 147 B.R. at 657. In order to determine whether a break-up fee encourages rather than hampers bidding, courts have considered whether an agreement to pay such a fee:

   (a) Attracts or retains a potentially successful bid;

   (b) Establishes a bid standard or minimum for other bidders to follow; or

   (c) Attracts additional bidders.

*Id.* at 662. A break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the prospective purchaser's risk, effort and expenses. *Id.* at 662; *see also In re 995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

  19. Application of the business judgment test, as set forth above, illustrates that Debtor should be authorized to pay the Break-up Fee as provided above in connection with the sale of the Equipment. The payment of the Break-up Fee is critical to the continuing obligation of Stalking Horse to purchase the Equipment. Without provision for the Break-up Fee in the event a third party comes forward subsequent to the filing of the bankruptcy petition and offers more for the Equipment, Stalking Horse would not have agreed to purchase the Equipment. Stalking Horse has invested a substantial amount of time and money in evaluating the Equipment and negotiating the purchase of the Equipment. The proposed Break-up Fee was in fact necessary to secure the firm agreement from Stalking Horse to purchase the Equipment. The Break-up Fee clearly should be approved under the standards articulated by the various courts.

  20. The Break-up Fee results from good faith, arm's-length negotiations between Debtor and Stalking Horse. The Break-up Fee is fair and reasonable in amount, particularly in

view of Stalking Horse's agreement to provide a DIP loan to Debtor. Additionally, the expenses incurred by the Stalking Horse to this Transaction are not inconsequential. For example, the Stalking Horse has made field examinations of much of the Equipment requiring its representatives to travel to a number of states for such examinations.

21. The Debtor also asserts that it is appropriate that the Debtor be authorized to use the Stalking Horse's Good Faith Deposit to fund its operations pending sale of the Equipment, in particular to protect and preserve the Equipment in order to facilitate the sale. The Debtor has no substantial revenue to fund operations and preserve and protect the Equipment, and all parties benefit from the sale of the Equipment as contemplated herein, including Zurich and CAT who may have liens on the Equipment. The use of Stalking Horse's Good Faith Deposit and repayment as set forth herein may be authorized by this Court pursuant to 11 U.S.C. §§ 105(a), 363(b), and 506(c). It is also appropriate to recognize that the Good Faith Deposit would receive administrative expense status under 11 U.S.C. Section 503(b).

WHEREFORE, Debtor prays that this Court:

    A.    Find that notice of this Motion is adequate under the circumstances and that any further notice of this Motion is excused for good cause shown;

    B.    Schedule a hearing as soon as possible, to consider the Bid Procedures set forth in this Motion;

    C.    Enter an order approving the Bid Procedures set forth in this Motion;

    D.    Provided that the Court approves this Motion, schedule the Sale Hearing;

    E.    Authorize Debtor to give notice of the Sale Motion in accordance with this Motion; and

    F.    Grant Debtor such additional relief as this Court deems equitable and just.

Dated: April 19, 2016

Respectfully submitted,

*/s/ Chad J. Kutmas*
Gary M. McDonald, OBA No. 5960
Chad J. Kutmas, OBA No. 19505
Mary E. Kindelt, OBA No. 21728
MCDONALD, MCCANN, METCALF &
CARWILE, LLP
First Place Tower
15 E. Fifth Street, Suite 1400
Tulsa, OK 74103
(918) 430-3700
(918) 430-3770 (Fax)

*Proposed Attorneys for the Debtor and
Debtor-in-Possession*